Albert J. Soler (AS1974)
Ajoe P. Abraham (AA7000)
Soler Salva LLP
270 W. 39th St., Suite 1304
New York, NY 10018
Tel: (646) 660-1961
Email: asoler@solersalva.com
Email: aabraham@solersalva.com

*Attorneys for Plaintiff Prime Entertainment Group LLC*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PRIME ENTERTAINMENT GROUP LLC, a Nevada limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>43 NORTH BROADWAY, LLC, a New York limited liability company; and DOES 1-10.<br><br>Defendant. | Civil Index No.: 1:25-cv-06329-DLC<br><br>**FIRST AMENDED COMPLAINT** |

## FIRST AMENDED COMPLAINT

Plaintiff, Prime Entertainment Group LLC (herein "Plaintiff" or "PEG"), a Nevada limited liability company, by and through its undersigned counsel, hereby submits its first amended complaint against 43 North Broadway, LLC (herein "Defendant" or "43 North") and alleges as follows:

## NATURE OF THE ACTION

1. This case involves a set of narrow issue and this action is being initiated simply to rectify and curb 43 North's continued breach of the terms and conditions of 43 North's license

agreement and 43 North's express obligation to account for and pay royalties related to, and emanating from, 43 North's non-exclusive rights regarding the exploitation of the Licensed Recordings (as defined herein).

2. PEG is an authorized licensing and sales agent and the rights administrator of certain master sound recordings catalogs, including its own catalog and those owned by GCM (as defined herein).

3. PEG is an authorized licensing and sales agent for several sound recording catalogs owned by third parties which include master sound recordings by, among others, the late Arthur "Big Boy" Crudup, an American blues singer, guitarist, and songwriter (herein "Crudup") best known, perhaps, for his recordings of "That's All Right" and "My Baby Left Me."

4. PEG is also the owner of thousands of valuable and highly licensable master sound recordings that are distributed across numerous music streaming platforms by PEG's contractually authorized third-party distributors.

5. PEG, at all relevant times, was, and is, a duly authorized representative, licensing agent, and sales agent of Gulf Coast Music LLC ("GCM") pursuant to an Appointment of Sales Agent Agreement dated November 30, 2000, which, among other things, authorizes PEG to enforce any and all licenses made pursuant to PEG's role as a duly authorized representative of GCM.

6. While PEG acknowledges that 43 North is the rightful owner of certain master sound recordings that are exclusively controlled by 43 North such recordings are not the subject of PEG's instant action, which focuses solely on 43 North's intentional and willful breach of its obligation to pay royalties emanating from the exploitation of the PEG, GCM, and third-party owned Licensed Recordings (as defined herein), that are controlled and licensed by PEG.

7. In or around 2017 and 2018, after a series of negotiations and an ultimate agreement with Fuel 2000 Records, Inc. (herein "F2K"), which, at that time, owned and/or controlled on a licensed basis various rights to catalogs of master sound recordings, including sound recordings comprising the PEG Catalog and GCM Catalog (as defined herein) (the "Licensed Recordings"), 43 North (a) purchased from F2K certain non-exclusive rights to exploit and distribute the catalogs comprised of the Licensed Recordings and (b) became F2K's successor-in-interest with respect to various royalty payment and accounting obligations to which 43 North succeeded and would, post-acquisition owe to various third-party rights holders.

8. Notably, 43 North's dealings and agreement with F2K with respect to PEG, PEG's own catalog of recordings, and with respect to GCM and GCM's catalog of recordings, to the extent those catalogs comprised part of the Licensed Recordings that F2K was entitled to distribute on a non-exclusive, royalty-bearing basis, *did not grant nor otherwise convey* to 43 North any ownership interest to the Licensed Recordings, which were included in the catalogs belonging, in part, to PEG, GCM, and other third parties.

9. Importantly, 43 North has acknowledged and confirmed via emails and related communications that PEG, on its own behalf and as an authorized agent on behalf of GCM via the F2K-43 North Agreement (as defined herein), had granted 43 North a limited non-exclusive, perpetual, worldwide license to exploit certain catalogs of non-exclusively licensed master recordings, including the Crudup Recordings.

10. 43 North's intentional refusal to pay contractually agreed upon royalties continues to prejudice and significantly harm not only PEG and GCM, but also the *numerous third-party rights holders* whose performances are embodied in the Licensed Recordings.

11. 43 North continues to use and exploit the Licensed Recordings, but the royalties owed to PEG and GCM remain unpaid due to 43 North's brazen disregard of its assumed contractual obligations related to the Licensed Recordings.

12. PEG brings this action to seek redress for 43 North's improper and intentional breach of the terms and conditions of 43 North's license agreement and 43 North's express obligation to account for and pay royalties related to, and emanating from, 43 North's non-exclusive rights regarding the exploitation of the Licensed Recordings; specifically, in connection with the master sound recordings in the PEG Catalog and GCM Catalog.

## THE PARTIES

13. Plaintiff Prime Entertainment Group, LLC is a limited liability company organized under the laws of the State of Nevada with a principal place of business located at 8033 Sunset Boulevard #1250, Los Angeles, California 90046.

14. Upon information and belief, Defendant 43 North Broadway, LLC is a limited liability company organized under the laws of the State of New York with a principal place of business in this judicial District.

## JURISDICTION AND VENUE

15. The Court has diversity jurisdiction over the instant dispute and parties pursuant to 28 U.S.C. 1332(a)(1), which confers original jurisdiction upon the federal district courts over all civil actions wherein the amount in controversy exceeds $75,000 and the dispute is between a citizen of different states (i.e., Nevada and New York).

16. This Court has personal jurisdiction over Defendant because Defendant is a limited liability company organized under the laws of the State of New York and its conduct, as alleged in this Complaint, was purposefully directed at, among others, music streaming platforms, internet

platforms, individuals, and music distribution platforms who are located in, have a significant presence in, or transact substantial business in the State of New York.

17. Venue is proper in this judicial district for all causes of action pursuant to 28 U.S.C. §§1391(b)(1) & (b)(2) and 1400(b) in that Defendant resides in and transacts business in this Judicial District and a substantial part of the events or omissions giving rise to the claims herein occurred within this Judicial District.

## FACTUAL BACKGROUND

18. PEG is an authorized licensing agent and administrator of various sound recording catalogs, including (a) PEG's own sound recording catalog (the "PEG Catalog") and (b) sound recording catalogs owned by GCM, including, among others, the GCM distributed catalogues known as: Fire Records and Fury Records, Red Robin Records, Whirlin' Disc, Everest Records, and Enjoy Records (collectively, the "GCM Catalog").

19. GCM's founder, the late Marshall E. Sehorn, was the Artist and Repertoire (A&R) director for Fire & Fury Records, had a direct relationship with the late Bobby Robinson, the legendary founder of Fire & Fury Group fame and was, in fact, Mr. Robinson's employee as far back as the early 1960s.

20. The Sehorn-Fury-Fire Agreement (as defined herein) evidences the fact that GCM obtained non-exclusive perpetual rights to the recordings comprising the Fury Records and Fire Records master sound recordings catalogs, which include, among others, the Crudup recordings that 43 North continues to wrongfully claim exclusive ownership of. Mr. Sehorn's non-exclusive rights were then subsequently transferred in their entirety to GCM, who then in turn granted to PEG the non-exclusive right to license the recordings on GCM's behalf.

21. PEG and GCM are also signatories, licensee parties, and/or successors in interest to various licensing agreements and related contracts regarding the licensing and administration of sound recording catalogs owned exclusively by record labels Vault Records, Janus Records, and Applause Records.

22. As noted, PEG was and is a duly authorized representative and licensing agent of GCM pursuant to an Appointment of Sales Agent Agreement dated November 30, 2000.

23. As an authorized representative and licensing agent of GCM, PEG is the administrator of rights in and to master sound recordings which are owned or otherwise licensed in perpetuity to GCM, including the recordings comprising the GCM Catalog, which includes the Crudup recordings.

24. Several of the Crudup recordings, including "Looka There, She Got No Hair," "Death Valley Blues," and "That's All Right," are *expressly listed* as an exhibit to a November 16, 1962 agreement between Mr. Sehorn and Fury Records, Inc and Fire Records, Inc. (the "Sehorn-Fury-Fire Agreement").

25. Both the PEG Catalog and the GCM Catalog contain thousands of highly licensable and sought-after sound recordings and titles whose success and continuing popularity span across multiple decades and a wide variety of musical genres.

26. On March 31, 2001, GCM entered into a license agreement with F2K, an entity then owned, controlled, and operated by record label executive, artists personal manager, and concert producer/promoter Leonard C. Fico (herein "Fico").

27. Pursuant to the terms of the license agreement, GCM granted to F2K, among other things, the exclusive right to manufacture physical sound recordings in its catalog, as well as the non-exclusive right to otherwise use and license such recordings in non-physical forms. Such

licensed rights were, as to physical products, authorized by GCM to be utilized by F2K exclusively in and throughout a contractually prescribed territory and non-exclusively as to all other uses throughout the world, in exchange for and in consideration of specified royalties payable to GCM (the "GCM-F2K License Agreement").

28. F2K, therefore, was an authorized licensee of the entirety of the sound recording catalog licensed by GCM pursuant to the terms and conditions of the GCM-F2K License Agreement, including both an ability to grant sub-licenses to third parties and to assign its contractual rights – subject to an assumption of its corresponding obligations – to successors such as 43 North.

29. Section 4 of the GCM-F2K License Agreement required that F2K, as the licensee, pay GCM royalties in various amounts based, in the case of physical products, on their suggested retail list price and in all other instances in an amount equal to fifty percent (50%) of F2K's revenues derived from all uses other than the sale of physical goods. All such accounting and payment obligations were, and remain, a condition of the use, distribution and sale of sound recordings of any kind derived from the Licensed Recordings.

30. Thus, F2K was obligated to account for and pay any royalties to GCM in accordance with the terms of the GCM-F2K License Agreement. PEG, as GCM's authorized agent, is entitled to bring this action to collect the royalties due and to otherwise enforce GCM's rights against 43 North.

31. Next, pursuant to a March 1, 2002 Asset Purchase Agreement entered into by and between PEG and F2K (the "PEG-F2K APA)", PEG[1] sold and conveyed to F2K all right, title, and

---

[1] The majority control of PEG was eventually purchased by Fico's Nasjon Properties LLC in or about May 2020.

interest to PEG's library of the "non-exclusive musical masters" referenced in Exhibit A of the PEG-F2K APA.

32. As noted, however, PEG remained, at all times, a duly authorized licensing agent for both the PEG Catalog and the GCM Catalog of sound recordings.

33. Specifically, the PEG-F2K APA unequivocally stated that F2K was acquiring the "non-exclusive" master sound recordings in Exhibit A (attached thereto) in exchange for the purchase price, which included a perpetual fifty percent (50%) participation in the net receipts emanating from F2K's continuing exploitation of the non-exclusive master recordings and all rights therein.

34. As to royalties, Section 3.6 of the PEG-F2K APA required that F2K, as the purchaser, continue to pay or cause to be paid all royalties which may become due to any third-party royalty recipients pursuant to any applicable contract between the third parties and PEG or its predecessors in interest.

35. The PEG-F2K APA was binding on F2K, as well as on any of its successors and assigns, including 43 North.

36. PEG remained the licensing agent and administrator of the PEG and GCM Catalogs of music and F2K was obligated (as would be its successors and assigns such as 43 North) to direct all subsequent participating royalty payments resulting from the use of the Licensed Recordings to PEG.

**<u>43 North's Acquisition of F2K's Right to the Licensed Masters</u>**

37. Pursuant to an October 13, 2015 Asset Purchase Agreement entered into by and between F2K and 43 North (the "43 North-F2K APA"), 43 North acquired from F2K rights to certain sound recording assets.

38. Specifically, 43 North (a) acquired rights related to certain master sound recordings and (b) assumed F2K's pre-existing and ongoing contractual obligations to third parties, including PEG, GCM and various other royalty recipients (e.g., recording artists) of the Licensed Recordings.

39. Pursuant to the agreement, 43 North was, and is, obligated to account for and pay royalties to all such royalty recipients, including PEG and GCM.

40. PEG has initiated this lawsuit to stem 43 North's willful and intentional breach of its royalty payment obligations emanating from the exploitation by 43 North of the Licensed Recordings pursuant to the 43 North-F2K APA.

41. Specifically, Section 1.01(a) of the 43 North-F2K APA, specifies that 43 North acquired F2K's interests in "the sound recordings owned, controlled, *or licensed* by" F2K (*emphasis* added), as set forth in Schedules A, A-1, and A-2 of the 43 North-F2K APA.

42. Importantly, Schedule A-2 clearly lists and *identifies the Licensed Recordings* that had (a) been licensed by F2K in perpetuity and (b) which F2K did not own.

43. 43 North was, at all times, nothing more than an authorized licensee of the Licensed Recordings constituting the contained in the sound recording catalogs F2K controlled and administered.

44. Other than having certain limited exclusive rights related solely to the manufacturing and sale of physical products, the fact is that 43 North, with respect to the digital uses of the Licensed Recordings, (a) negotiated for and obtained non-exclusive worldwide rights to the Licensed Recordings in perpetuity and (b) was assigned and succeeded to the licensing agreement previously in place between F2K and PEG.

45. Section 1.01(b) through (d) clearly state that 43 North was subject to the terms and conditions of the (a) recording agreements and licenses "with the recording artists," (b) all other agreements pertaining to the master sound recordings, including agreements with third-party rights holders, and (c) all agreements between F2K and third-party rights holders.

46. In fact, an assignment and assumption agreement was appended as part of the 43 North-F2K APA, wherein 43 North became the successor-in-interest to the pre-existing agreements entered into by F2K and third-party rights holders.

47. In light of the above, 43 North's failure to pay the royalties 43 North contracted to pay is brazen and highly improper.

48. 43 North, as successor-in-interest to the F2K agreements, including the agreement with PEG, was also obligated to pay PEG a licensing royalty in the amount of fifty percent (50%) pursuant to the terms and conditions of the non-exclusive licenses 43 North obtained.

49. Nonetheless, 43 North has, and continues to, refuse to pay both PEG, GCM, and third-party rights holders (through PEG) since, at least, 2019, and each refusal, therefore, constitutes an express breach of 43 North's contractual obligations to pay royalties related to the exploitation of the Licensed Recordings as set forth in the 43 North-F2K APA and related agreements.

50. The 43 North-F2K APA also obligated 43 North to remit royalty and other payments to PEG and GCM for the use of their respective catalogs of music.

51. In the case of GCM, such royalties for the sale of physical products were based on the various suggested retail list selling prices of recordings derived from the Licensed Recordings and in the case of digital sales, a continuing royalty equal to fifty percent (50%) of all of 43 North's gross sums received from its digital use of the same.

52. The contractual terms set forth in the relevant agreements are clear and unequivocal, yet 43 North continues to intentionally breach their contractual obligations to the detriment of PEG, GMC, and third-party rights holders to the Licensed Recordings.

53. PEG has demanded – *for years* – that 43 North comply with their obligation to pay all requisite third-party royalties including, among others, emails to 43 North yet 43 North continues to intentionally and willfully breach the express terms of the licensing agreement and the exploitation of the Licensed Recordings.

54. For example, in a January 3, 2019 email, PEG states that 43 North had failed to provide "a report, statement or payment on statements" since 2015 and that PEG did not "understand what [43 North was] doing." The email also reflects the fact that 43 North was avoiding PEG in efforts to avoid or delay discussion to address the habitual repeated failure of 43 North to satisfy its royalty payment obligations and continuing breach thereof.

55. Indeed, 43 North continues to breach the express terms of the 43 North-F2K APA, as well as their duty to account to PEG and the rights holders, in attempts to avoid their contractual obligations and 43 North's obligation to pay royalties emanating from its exploitation of the Licensed Recordings.

56. As discussed, 43 North has only a non-exclusive right to use the Licensed Recordings subject to, at all times, 43 North's ongoing royalty payment obligations as required by the terms and conditions of the 43 North-F2K APA.

57. 43 North's conduct is brazen and improper because 43 North was fully aware that 43 North had only been granted no more than a *non-exclusive license* to the Licensed Recordings pursuant to the 43 North-F2K APA.

58. 43 North's improper conduct is intended to further its intentional and willful breach of its contractual obligations to pay royalties emanating from the exploitation of the Licensed Recordings and to continue to improperly deprive PEG and GCM respectively of revenue, royalties, and payments owed related to the exploitation of PEG's and GCM's Licensed Recordings.

59. For the sake of clarity, 43 North's non-exclusive rights to the Licensed Recordings does not in any way diminish, restrict, or supersede the identical continuing non-exclusive, worldwide, perpetual rights of PEG and/or GCM in the same recordings.

60. Importantly, PEG acknowledges that 43 North has its own rights to exploit the Licensed Recordings; however, such rights are subject to 43 North's obligations to account for and pay PEG the royalties specified and set forth in the 43 North-F2K APA.

61. As noted, while 43 North does have some exclusive rights to other unrelated sound recordings, 43 North's failure to pay royalties related to its exploitation of the PEG and GMC Licensed Recordings continues to cause significant injury to PEG and GCM.

62. 43 North is fully aware that it is merely a successor-in-interest to F2K's perpetual license and non-exclusive rights to the Licensed Recordings pursuant to the express terms and conditions of the 43 North-F2K APA.

**43 North's Breach of Contract and Failure to Pay Agreed Upon Royalties**

63. As noted, pursuant to Sections 1.01(b) and (c) and Section 3.06 of the 43 North-F2K APA, 43 North became a successor-in-interest to the obligations PEG had with respect to the various contracts and agreements that had been entered into by F2K, as set forth in Schedules 8, C, and D of the 43 North-F2K APA.

64. First, Section 1.01(b) clearly states that 43 North had acquired certain "Recording Agreements and licenses with the recording artist [] listed on Schedule B (the "Artist Agreements") related" to the master sound recordings purchased by 43 North as part of the sales transaction.

65. Second, pursuant to Section 1.01(c) and by virtue of the purchase transaction, 43 North became successor-in-interest to "All other agreements [] pertaining to" the master sound recordings as part of the purchase transaction," as memorialized in Exhibit C to the 43 North-F2K APA (i.e., the "Assignment and Assumption Agreement").

66. Third, pursuant to Section 1.01(d) and by virtue of the purchase transaction, 43 North became successor-in-interest to "All agreements between [F2K] and Distributors for the exploitation [of the sound recordings] listed on Schedule D[,]" as memorialized in the Assignment and Assumption Agreement.

67. Fourth, pursuant to Section 5.03(a) and by virtue of the purchase transaction, 43 North assumed "all third-party royalty obligations created by the [contracts] by virtue of the income derived" from the acquired sound recordings and exploitation of the Licensed Recordings pursuant to the non-exclusive licensed acquired by 43 North.

68. 43 North's royalty payment obligations were specifically noted, re-confirmed and conveyed to 43 North in writing in an October 13, 2015 letter from F2K to 43 North (requested by 43 North to be issued pursuant to the 43 North-F2K APA), which states that 43 North would be "solely responsible for and pay all royalties due to the respective artists [and that] it is hereby understood that [43 North] shall pay such royalties to the respective artists (or entities on their behalf) as part of its royalty accountings for the semi-annual period [.]"

69. As a further example, 43 North has also failed to account to PEG and GCM and remit the requisite royalty payments for numerous sound recordings by the Archies, an American

fictional rock band prominently featured in the Archies Comics series, which belong to GCM with PEG serving, again, as an authorized licensor.

70. Indeed, the Archies recordings expressly appear on the list of music 43 North licensed on a non-exclusive basis in perpetuity, subject to 43 North's royalty payment and accounting obligations which 43 North brazenly continues to breach.

71. Clearly, 43 North had assumed certain associated agreements that F2K had entered into with artists, producers, and distributors, for the purpose of releasing sound recordings under one of several record labels.

72. Clearly, 43 North also succeeded to, and were responsible for, compliance with all terms and conditions of the artist, distribution, and other agreements as set forth in Section 1.01 of the 43 North-F2K APA, including, without limitation, the obligation to remit royalty payments to third parties pursuant to such agreements.

73. As referenced above, Section 3.09 of the 43 North-F2K APA clearly states that F2K owned certain master sound recording and, relevant to this lawsuit, had a non-exclusive license to the Licensed Recordings.

74. 43 North has, as noted, also intentionally failed to remit and pay royalties and other monies owed to PEG and its third-party rights holders (including GCM) emanating from the exploitation of the Licensed Recordings, despite having expressly assumed such payment obligations as part of the terms and conditions of the 43 North-F2K APA.

75. As a result, 43 North is in breach of the relevant agreements and has intentionally diverted significant royalty streams and other monies from PEG, GCM, and other third-party rights holders represented by PEG, who are owed royalties pursuant to the various agreements 43 North assumed as part of the 43 North-F2K APA.

76. PEG has made several attempts to discuss this issue and dispute with 43 North to no avail and, as such, PEG are forced to bring this action to remedy the improper conduct and to protect the rights of PEG and various third-party rights holders in PEG's capacity as the licensing agent and administrator of the Licensed Recordings.

## FIRST CAUSE OF ACTION
**Breach of Contract By Third-Party Beneficiary PEG**

77. PEG repeats and incorporates by reference each and every allegation set forth above as if fully set forth herein.

78. PEG is a third-party beneficiary to the 43 North-F2K APA and is owed royalties from 43 North emanating from 43 North's exploitation of the Licensed Recordings, which include sound recordings from the PEG Catalog and the GCM Catalog.

79. Pursuant to the 43 North-F2K APA, 43 North acquired from F2K (a) certain sound recording assets, (b) certain rights related to certain master sound recordings, and (c) assumed F2K's contractual obligations with third-parties having an interest and royalty-bearing rights in and to the Licensed Recordings, which included the obligation to pay royalties to the Licensed Recordings owned by PEG and comprising the PEG Catalog.

80. Pursuant to Sections 1.01(b) and (c) and Section 3.06 of the 43 North-F2K APA, 43 North became a successor-in-interest to the obligations PEG had with respect to the various contracts and agreements that had been entered into by F2K, as set forth in Schedules 8, C, and D of the 43 North-F2K APA.

81. First, Section 1.01(b) clearly states that 43 North had acquired certain "Recording Agreements and licenses with the recording artist [] listed on Schedule B (the "Artist Agreements") related" to the master sound recordings purchased by 43 North as part of the sales transaction.

82. Second, pursuant to Section 1.01(c) and by virtue of the purchase transaction, 43 North became successor-in-interest to "All other agreements [] pertaining to" the master sound recordings as part of the purchase transaction," as memorialized in Exhibit C to the 43 North-F2K APA (i.e., the "Assignment and Assumption Agreement").

83. Third, pursuant to Section 1.01(d) and by virtue of the purchase transaction, 43 North became successor-in-interest to "All agreements between [F2K] and Distributors for the exploitation [of the sound recordings] listed on Schedule D[,]" as memorialized in the Assignment and Assumption Agreement.

84. Fourth, pursuant to Section 5.03(a) and by virtue of the purchase transaction, 43 North assumed "all third-party royalty obligations created by the [contracts] by virtue of the income derived" from the acquired sound recordings and exploitation of the Licensed Recordings pursuant to the non-exclusive licensed acquired by 43 North.

85. 43 North's royalty payment obligations were specifically noted, re-confirmed and conveyed to 43 North in writing in an October 13, 2015 letter from F2K to 43 North (requested by 43 North to be issued pursuant to the 43 North-F2K APA), which states that 43 North would be "solely responsible for and pay all royalties due to the respective artists [and that] it is hereby understood that [43 North] shall pay such royalties to the respective artists (or entities on their behalf) as part of its royalty accountings for the semi-annual period [.]"

86. As such, PEG was, at all times, an expressly intended beneficiary designated to receive royalty payments under the 43 North-F2K APA and the accompanying Assumption and Assignment Agreement.

87. 43 North's intent to benefit PEG as a third-party recipient of royalties related to the exploitation of the Licensed Recordings, which included both PEG owned and represented sound

recordings, is clear given that 43 North signed both the 43 North-F2K APA and the accompanying Assumption and Assignment Agreement.

88. 43 North has, and continues to, willingly and intentionally breach the terms and conditions of the 43 North-F2K APA by improperly refusing to pay contractually required royalties emanating from the exploitation of the Licensed Recordings as required by the 43 North-F2K APA and related agreements.

89. Indeed, the entire purpose of the licensing agreement and 43 North's principal obligation thereunder is the payment of royalties emanating from the exploitation of the Licensed Recordings, which 43 North continues to breach via its non-payment.

90. 43 North's prior counsel expressly acknowledged that 43 North, in fact, owed royalties emanating from the exploitation of the Licensed Recordings in an email dated May 10, 2017, wherein 43 North's representative states that 43 North would pay PEG and GCM an advance "against all royalties and any other sums due to it pursuant to all the Agreements between Prime/Gulf and 43 North."

91. PEG is the licensor and rights administrator to the Licensed Recordings, including sound recordings comprising the PEG Catalog.

92. 43 North's intentionally refusal to pay to PEG the agreed-upon and contractually mandated royalties related to the exploitation of the Licensed Recordings constitutes a clear and intentional breach of the terms and conditions of the 43 North-F2K APA, of which PEG is a third-party beneficiary.

93. 43 North's breach of the royalty payment obligations expressly referenced in the 43 North-F2K APA is deliberate, willful, and in clear disregard of PEG's and GCM's ownership and

contractual rights to the Licensed Recordings, including sound recordings comprising the PEG Catalog.

94. 43 North's blatant breach of contract has resulted in significant damages to PEG and has, additionally, resulted in non-payment of royalty monies duly owed to both PEG and various third-party rights holders as set forth in the 43 North-F2K APA.

95. 43 North knowingly and intentionally continues to engage in improper conduct and seeks to gain a direct financial and competitive benefit from their breach of contract to the detriment of PEG.

96. As the direct result of 43 North's improper conduct and breach, PEG has been significantly damaged and harmed in amount to be determined at trial.

## SECOND CAUSE OF ACTION
**Breach of Contract By Third-Party**
**Beneficiary PEG As Authorized Licensing Agent of GCM**

97. PEG repeats and incorporates by reference each and every allegation set forth above as if fully set forth herein.

98. PEG is a third-party beneficiary to the 43 North-F2K APA and an authorized licensing agent of GCM, who is also a third-party beneficiary to the 43 North-F2K APA.

99. Pursuant to the 43 North-F2K APA," 43 North acquired from F2K (a) certain sound recording assets, (b) certain rights related to certain master sound recordings, and (c) assumed F2K's contractual obligations with third-parties having an interest and royalty-bearing rights in and to the Licensed Recordings, which included the obligation to pay royalties to the Licensed Recordings owned by GCM and comprising the GCM Catalog.

100. PEG, at all relevant times, was, and is, a duly authorized representative, licensing agent, and sales agent of Gulf Coast Music LLC ("GCM") pursuant to an Appointment of Sales

Agent Agreement dated November 30, 2000, which, among other things, expressly authorizes PEG to enforce "all third party licenses" made pursuant to PEG's role as a duly authorized representative, licensing agent, and sales agent.

101. 43 North has, and continues to, willingly and intentionally breach the terms and conditions of the 43 North-F2K APA by improperly refusing to pay contractually required royalties emanating from the exploitation of the Licensed Recordings as required by the 43 North-F2K APA and related agreements. 43 North's prior counsel expressly acknowledged that 43 North, in fact, owed royalties emanating from the exploitation of the Licensed Recordings in an email dated May 10, 2017, wherein 43 North's representative states that 43 North would pay PEG and GCM an advance "against all royalties and any other sums due to it pursuant to all the Agreements between Prime/Gulf and 43 North."

102. 43 North also continues to breach the 43 North-F2K APA in efforts to further its breach of its obligations to pay royalties emanating from the exploitation of the Licensed Recordings as required by the 43 North-F2K APA and related agreements.

103. 43 North is well-aware that they were only granted a non-exclusive right and corresponding royalty-bearing obligation to exploit the Licensed Recordings comprising the GCM Catalog.

104. PEG is the licensor and rights administrator to the Licensed Recordings, including sound recordings comprising the GCM Catalog.

105. 43 North's improper conduct constitutes a clear and intentional breach of the terms and conditions of the 43 North-F2K APA, of which GCM is a third-party beneficiary.

106. 43 North's improper conduct and non-payment of the contractually mandated royalties constitutes a clear and intentional breach of 43 North's obligation to pay any and all royalties owed to GCM.

107. 43 North's breach of the royalty payment obligations expressly referenced in the 43 North-F2K APA is deliberate, willful, and in clear disregard of GCM's ownership and contractual rights in the Licensed Recordings, including sound recordings comprising the GCM Catalog.

108. 43 North's blatant and intentional breach of contract has resulted in significant damages to GCM and has, additionally, resulted in non-payment of royalty monies duly owed to both GCM and various third-party rights holders as set forth in the 43 North-F2K APA.

109. 43 North knowingly and intentionally continues to engage in improper conduct and seeks to gain a direct financial and competitive benefit from their breach of contract to the detriment of GCM.

110. As the direct result of 43 North's improper conduct and breach, GCM has been significantly damaged and harmed at an amount to be determined at trial.

**THIRD CAUSE OF ACTION**
**Unjust Enrichment – In the Alternative to Breach of Contract As to 43 North Pertaining to Third Party Beneficiary PEG**

111. PEG repeats and incorporates by reference each and every allegation set forth above as if fully set forth herein.

112. PEG asserts this claim for unjust enrichment as an alternative to the breach of contract claim set forth in PEG's First Cause of Action and seeks restitution for 43 North's unjust enrichment from 43 North's exploitation of PEG's Licensed Recordings without paying the corresponding royalties properly owed and due to PEG.

113. 43 North has directly benefitted from its exploitation of the PEG Licensed Recordings by exploiting, licensing, and commercialization of PEG's Licensed Recordings without remitting payment of the requisite and required royalties to PEG.

114. 43 North, therefore, has, and continues to, retain a significant financial benefit resulting from 43 North's exploitation of PEG's Licensed Recordings at the expense of PEG.

115. 43 North received and retained this significant financial benefit related to 43 North's continued exploitation of PEG's Licensed Recordings at the direct expense of PEG, as a third-party beneficiary entitled to royalties from 43 North's exploitation of PEG's Licensed Recordings.

116. PEG has been deprived of the compensation and royalties PEG was rightfully due and owned while 43 North profited and unjustly earned from 43 North's exploitation of PEG's Licensed Recordings.

117. Fairness, equity, and good conscience require restitution by 43 North for its intentional refusal to pay PEG royalties, while continuing to exploit, commercialize, and earn from PEG's Licensed Recordings for its own benefit, which creates an inequitable scenario that demands judicial intervention to prevent 43 North's unjust enrichment.

118. 43 North's exploitation of PEG's Licensed Recordings without payment of requisite royalties has resulting in 43 North's unjust enrichment at PEG's expense and to PEG's detriment and equity demands restitution and payment of all royalties owed and payable by 43 North to PEG.

119. As the direct result of 43 North's improper conduct and breach, PEG has been significantly damaged and harmed in amount to be determined at trial.

## FOURTH CAUSE OF ACTION

**Unjust Enrichment – In the Alternative to Breach of Contract As to 43 North Pertaining to Third Party Beneficiary GCM**

120. PEG repeats and incorporates by reference each and every allegation set forth above as if fully set forth herein.

121. PEG asserts this claim for unjust enrichment as an alternative to the breach of contract claim set forth in PEG's Second Cause of Action and seeks restitution for 43 North's unjust enrichment resulting from 43 North's exploitation of GCM's Licensed Recordings without payment the corresponding royalties properly owed and due to GCM.

122. PEG, at all relevant times, was, and is, a duly authorized representative, licensing agent, and sales agent of GCM pursuant to an Appointment of Sales Agent Agreement dated November 30, 2000, which, among other things, expressly authorizes PEG to enforce "all third party licenses" made pursuant to PEG's role as a duly authorized representative, licensing agent, and sales agent.

123. PEG is, as GCM's duly authorized representative, is contractually entitled to payment of fifty percent (50%) of the royalties emanating from 43 North's exploitation of the GCM Licensed Recordings pursuant to the Appointment of Sales Agent Agreement, an amount which PEG is being wrongfully denied as a direct result of 43 North's refusal to comply with its royalty payment obligations.

124. 43 North has directly benefitted from its exploitation of the GCM Licensed Recordings by exploiting, licensing, and commercialization of GCM's Licensed Recordings without remitting payment of the requisite and required royalties owed to GCM and PEG.

125. 43 North, therefore, has, and continues to, retain a significant financial benefit resulting from 43 North's exploitation of GCM's Licensed Recordings at the expense of GCM and PEG.

126. 43 North received and retained this significant financial benefit related to 43 North's continued exploitation of GCM's Licensed Recordings at the direct expense of GCM and PEG, who are both entitled to royalties from 43 North's exploitation of GCM's Licensed Recordings (i.e., PEG is entitled to a share of GCM's royalties).

127. GCM and PEG have been deprived of the compensation and royalties they are rightfully due and owed, while 43 North profited and unjustly earned from 43 North's exploitation of GCM's Licensed Recordings.

128. Fairness, equity, and good conscience require restitution by 43 North for its intentional refusal to pay GCM royalties, while continuing to exploit, commercialize, and earn from GCM's Licensed Recordings for its own benefit, which creates an inequitable scenario that demands judicial intervention to prevent 43 North's unjust enrichment.

129. 43 North's exploitation of GCM's Licensed Recordings without payment of requisite royalties has resulting in 43 North's unjust enrichment at GCM's expense and to GCM and PEG's detriment and equity demands restitution and payment of all royalties owed and payable by 43 North to GCM, through PEG.

130. As the direct result of 43 North's improper conduct and breach, PEG has been significantly damaged and harmed in amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendant and grant to Plaintiff the following relief:

1. As to the First Cause of Action, compensatory damages for breach of contract in an amount to be determined at trial;

2. As to the Second Cause of Action, compensatory damages for breach of contract in an amount to be determined at trial;

3. As to the Third Cause of Action, all appropriate relief, including restitution, of all benefits 43 North has received form its improper exploitation of PEG's Licensed Recordings in an amount to be determined at trial;

4. As to the Fourth Cause of Action, all appropriate relief, including restitution, of all benefits 43 North has received form its improper exploitation of GCM's Licensed Recordings in an amount to be determined at trial;

5. As to All Causes of Action:

(a) Pre-judgment and post-judgment interest to the extent allowable by law;

(b) An award of PEG's costs and reasonable attorneys' fees in this action; and

(c) Such other and further relief as the Court deems just and proper.

DATED: January 5, 2026

SOLER SALVA LLP

________________________
Albert J. Soler (AS1974)
270 W. 39th St., Suite 1304
New York, NY 10018
Tel: (646) 660-1961
Email: asoler@solersalva.com

**CERTIFICATE OF SERVICE**

I hereby certify that on the 5th day of January 2026, I served the foregoing FIRST AMENDED COMPLAINT on:

COZEN O'CONNOR

Lisa A. Ferrari (LF8081)
Keren Dadon (KD5428)
3 WTC, 175 Greenwich Street, 55th Floor
New York, New York 10007
Telephone: 212-297-2699

*Attorneys for the Defendant*

via email at:

Lferrari@cozen.com
Kdadon@cozen.com

Dated: January 5, 2026
New York, New York

By: /s/ Albert J. Soler
Albert J. Soler, Esq.